**UNITED STATES DITRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CIVIL ACTION NO. 5:12-CV-00132-TBR**

COMMONWEALTH OF KENTUCKY,
by and through the
EDUCATION AND WORKFORCE
DEVELOPMENT CABINET
KENTUCKY OFFICE FOR THE BLIND                                    Plaintiffs,

v.

UNITED STATES OF AMERICA                                         Defendant.

**MEMORANDUM OPINION**

This matter comes before the Court upon dual motions filed by the Commonwealth of Kentucky, by and through the Education and Workforce Development Cabinet Office for the Blind, to which the United States has responded. These motions include the Commonwealth's Motion for Permanent Injunction, (Docket No. 27), and its Motion to Dismiss the Defendant's Counterclaim, (Docket No. 34).[1] The Court will address each of these motions below.

**Background**

The contract dispute at the heart of this litigation centers upon the Randolph-Sheppard Vending Stand Act ("the Randolph-Sheppard Act" or "the Act"), which authorizes blind persons to operate vending facilities in federal buildings. 20 U.S.C. §§ 107-107e. Congress enacted the Act in 1936 in an effort to expand the economic opportunities available to the blind community. 20 U.S.C. § 107(a). Having repeatedly strengthened the Act in the decades thereafter, Congress has affirmed its motivating principles: "The dignity and pride engendered by the development of skills and entrepreneurial ability

---

[1] The United States has also filed a Motion for Hearing Oral Arguments. (Docket No. 37.) Because the Court finds that the facts and legal arguments are adequately presented in the parties' briefings and that the decision-making process would not be significantly aided by oral argument, this Motion will be denied.

represent the finest example of a healthy, vigorous, compassionate society combined with the true expression of an American ideal—self-respect, independence, and meaningful contribution to that society." S. Rep. No. 93-937 at 14 (1974).

The Act establishes a blind vendor program, requiring federal buildings—including military bases—to include a site where a blind person might establish and operate a vending facility, such as a cafeteria or a snack bar. 20 U.S.C. § 107a(d)(1); 20 U.S.C. § 107e(7). The Act affords blind vendors priority during the contract bidding process for the operation of such facilities pursuant to the following process. First, the United States Secretary of Education designates a state agency for the blind as the state licensing agency ("SLA"). 20 U.S.C. § 107a(a)(5). Although the Department of Education oversees the blind vendor program, considerable responsibility rests with SLAs: they provide the blind community with training, manage the procurement process, monitor the compliance of contracting agencies, and, if necessary, challenge any perceived non-compliance. *See* 20 U.S.C. §§ 107b(2), (6); 107d-4; 107a(b); 34 C.F.R. § 395.33. When a federal agency solicits vending-facility services, it must invite the SLA to bid on the contract. 34 C.F.R. § 395.33(b). So long as the SLA's proposal falls within a competitive range and has been ranked among those with a reasonable chance of being selected, the federal agency will give priority to the SLA's proposal. *See* 34 C.F.R. §§ 395.33(a) and (b). When a contract awarded to a blind vendor approaches expiration, the federal agency may negotiate with the SLA to renew the contract or may instead open bidding to the general public, but must again prioritize the SLA's bid pursuant to the Act's constraints. 34 C.F.R. § 395.33(d).

The Act establishes an arbitration procedure to govern disputes between SLAs and federal entities. *See* 20 U.S.C. §§ 107d-1(b), 107d-2(b)(2). An SLA asserting that a federal entity has failed to comply with the Act or its regulations may file a complaint with the Secretary of Education, who "shall convene" an arbitration panel to adjudicate the dispute. 20 U.S.C. § 107d-1(b). Such panels are authorized to conduct hearings and render decisions "which shall be subject to appeal and review as . . . final agency action[s] for purposes of Chapter 7 of . . . Title 5 [i.e., the Administrative Procedure Act]."

20 U.S.C. §107d-2(a); *see also* § 107d01(b) (arbitration decisions of such panels are "final and binding . . . except as otherwise provided in this chapter").   Arbitration panels have no affirmative remedial authority; instead, the federal agency found to have violated the act is itself charged with "caus[ing] such acts or practices to be terminated promptly and . . . tak[ing] such other action as may be necessary to carry out the decision of the panel."  20 U.S.C. § 107d-2(b)(2).

Kentucky's Office for the Blind ("the OFB"), the Commonwealth's SLA, initiated the instant lawsuit against the United States.  The action arises from a contract dispute concerning Fort Campbell, a military base located in Kentucky and operated by the United States through its Department of Defense ("DOD") and the Department of the Army ("the Army"), a DOD subdivision.   The parties share an extensive history, replete with both successful negotiation and full-throated disputes.  This lawsuit's story begins in 2007, when the Army solicited offers to provide full food services and dining facility attendant services ("DFA services") at Fort Campbell's dining facilities—that is, to provide meals and clean the mess halls.  The Army invited the Office for the Blind to submit a bid.  The OFB's licensed blind vendor, James Hardin, submitted a bid through his joint venture, First Choice Food Services ("First Choice"). Because the Army adjudged the bid to be within the competitive range, First Choice received priority and was granted the contract.  Thereafter, Faye Autry succeeded Hardin as the OFB's licensed blind vendor and the operator of First Choice.  The Army's contract with First Choice was scheduled to expire on September 30, 2012.

In anticipation of the contract's expiration, the Army decided to rely upon its own cooks to prepare and serve meals at Fort Campbell's dining facilities.  Consequently, the Army issued Solicitation W91248-13-D-00001 ("the Solicitation"), seeking bids for only the janitorial and custodial responsibilities that constitute DFA services.  The Solicitation pronounced that the Army would accept proposals exclusively from vendors who qualified for the Small Business Association's Historically Underutilized Business Zone ("HUBZone") program, an economic development initiative.  Neither First Choice nor the OFB qualified under the HUBZone program; accordingly, they were ineligible to compete

3

for the contract.   The Army awarded the DFA services contract to KCA Corporation, a HUBZone business, effective from April 1, 2013, through March 31, 2014—leaving First Choice and the blind vendor who operated it out of a job.

The OFB objected to the HUBZones classifications, pointing to a 2002 arbitration decision that determined that DFA services fell within the scope of the Randolph-Sheppard Act.  (Docket No. 1-4.) The Army responded that according to its interpretation, the Act applied only to contracts to operate military dining facilities, not those for only custodial and janitorial services. (Docket No. 1-6.)  As a result of the conflict, the OFB demanded arbitration with the Department of Education's Rehabilitative Services Administration pursuant to 20 U.S.C. §§107d-1, 20 U.S.C. § 107d-2, and 34 C.F.R. § 395.37.   The arbitration complaint asked a panel to find that the Army had violated the Act and to order it to comply with the Act's mandates.  (Docket No. 1-7.)  Three days later, the OFB filed a "Motion and Complaint for Temporary Restraining Order and Preliminary Injunction" in this Court, seeking a temporary restraining order or preliminary injunction "prohibiting the Army from either conducting the procurement and/or making award to an offeror pursuant to [the Solicitation] until such time as the arbitration proceeding required by 20 [U.S.C.] §107d-1(b) is concluded."  (Docket No. 1 at 14.)

After a hearing, this Court denied the OFB's request for injunction and dismissed the action without prejudice, determining that the OFB had failed to exhaust its administrative remedies.  (Docket No. 11 at 6-10.)  The Court further explained that even if the OFB had exhausted such remedies, its likelihood of success on the merits remained unclear.  Because the Government indicated that it would stay the solicitation and maintain the status quo during the arbitration's pendency, the Court concluded that the OFB was not confronted with irreparable harm in the interim.  (Docket No. 11 at 11.)  Although the OFB requested that the Court alter or amend its judgment concerning irreparable harm pursuant to Federal Rule of Civil Procedure 59, (Docket No. 19), the Court denied this motion, affirming again that it lacked jurisdiction in light of the OFB's failure to exhaust administrative remedies, (Docket No. 22.).

The Office for the Blind appealed the Court's rejection of the Rule 59 motion to the Sixth Circuit Court of Appeals.  It also filed a Motion for Injunction Pending Appeal pursuant to Federal Rule of Appellate Procedure 8, requesting that the Sixth Circuit enjoin the Army from awarding the contract for dining facility attendant services until arbitration was completed.  The Army responded that the Sixth Circuit had jurisdiction to consider only whether this Court erred in finding that no jurisdiction attached. The Army also filed a Motion to Dismiss Appeal, arguing that the appeal was moot because the Army had already awarded the contract.  The Sixth Circuit denied both the OFB's Motion for Injunction Pending Appeal and the Army's Motion to Dismiss Appeal on March 28, 2013.  *Kentucky Educ. & Workforce Dev. Cab. Office for the Blind v. United States*, No. 12-6610, at *3 (6th Cir. Mar. 28, 2013) (unpublished order).  Three days later, First Choice's contract with the Army expired; the next day, the winner of the solicitation began providing the DFA services at issue.

Meanwhile, the arbitration continued.  On February 14, 2014, the panel issued a divided decision in the Office for the Blind's favor, concluding that the Army's Solicitation violated the Act.  The panel determined that the Act encompasses Fort Campbell's DFA services:  "[B]y including the term 'mess attendant services in Section 1 [of the National Defense Authorization Act of 2007], [Congress] impliedly indicated those services are covered by the [Randolph-Sheppard Act]."  (Docket No. 27-2 at 26-27.)  The panel ordered the Army to terminate its contract with KCA Corporation on March 31, 2014, and to initiate negotiations with the OFB immediately for a new contract to begin on April 1, 2014.  (Docket No. 27-2 at 28).  Contrary to the panel's order, however, the Army renewed its contract with KCA Corporation.

In response, on March 28, 2014, the OFB filed a second lawsuit against the United States, this one seeking to enforce the arbitration panel's decision.  *See* Civil Action No. 5:14-cv-00056-TBR (hereinafter "the 2014 Action").  In that action, the OFB seeks a declaratory judgment that the Army's issuance of the contract to KCA Corporation violated the Act.  The OFB further seeks injunctive relief declaring the Army in violation of the Act and ordering the Army to comply with the arbitration panel's

decision—namely, by awarding the services to the OFB pursuant to a new contract.  (Civil Action No. 5:14-cv-00056-TBR, Docket No. 1.)  In the same action, the United States filed a counterclaim, seeking a judicial declaration that the Act does not apply to solicitations and contracts that only seek to procure DFA services and that the Act therefore does not apply to the specific contract at issue here.  (Civil Action No. 5:14-cv-00056-TBR, Docket No. 4.)

On July 21, 2014, the Sixth Circuit held that this Court erred in its earlier jurisdictional analysis. As the appellate court noted, Congress did not clearly state that federal jurisdiction hinged upon the Act's exhaustion requirement.  Therefore, the Office for the Blind was not required to exhaust its remedies before seeking relief from the federal courts.  (Docket No. 26 at 10.)  An exhaustion requirement need not be jurisdictional to be both effective and exacting, the Sixth Circuit explained; in this case, however, "exhaustion should have been excused because requiring the completion of arbitration prior to filing in federal court for a preliminary injunction would likely result in irreparable harm."  (Docket No. 26 at 13.) Had the Army's view of the Act accorded with the OFB's, it would have either negotiated exclusively with the OFB or reopened the bidding process but given the OFB's bid priority.  (Docket No. 26 at 13 (citing 34 C.F.R. § 395.33(d), § 395.33(a)-(b).)  Regardless, so long as First Choice's cost and quality were deemed competitive, the company would have continued to provide Fort Campbell's DFA services. However, because the Army instead issued the solicitation as a HUBZones set-aside, First Choice received no priority, the Army awarded the contract to another firm, and First Choice was forced to give up its business.  This unforgiving outcome for the OFB grows harsher still in light of sovereign immunity, which bars arbitration panels and federal courts alike from granting damages should the Army be found to have violated the Act.  (Docket No. 26 at 14.)  Therefore, the Sixth Circuit concluded, the OFB satisfied the irreparable-harm exception to the exhaustion requirement, and this Court should have considered the merits of its claim.  This Court's judgment was vacated and the case remanded for further proceedings consistent with the appellate opinion.

**Analysis**

I.      **Motion for Permanent Injunction**

The Court first turns to the Office for the Blind's Motion for Permanent Injunction, filed on August 14, 2014.   In light of the arbitration panel's conclusion that the Army's solicitation for DFA services violated the Act, the OFB now asks the Court to enjoin the Army from performing its contract with KCA Corporation.   The OFB further asks the Court to order the Army to terminate its contract with KCA Corporation and to immediately negotiate a new contract with the OFB.   (Docket No. 27.)

In general, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 392 (1981)).   In determining whether to grant injunctive relief, the Court weighs four factors:  (1) the moving party's success on the merits; (2) whether the moving party will suffer irreparable harm in the absence of an injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.  *Northeast Ohio Coal. for Homeless & Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).   These four considerations are factors to be balanced rather than prerequisites that must be met.  *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).

To obtain a permanent injunction, the plaintiff must demonstrate that:  (1) he has suffered an irreparable injury; (2) the remedies available at law, including money damages, are inadequate to compensate for the injury; (3) considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing *Weingbuger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542

(1987)).  The decision to grant a permanent injunction is within the judicial discretion of the district court. *Wayne v. Vill. of Sebring*, 36 F.3d 517, 531 (6th Cir. 1994).

The Court will proceed to discuss whether the OFB has adequately established these requisites.

### A.  Demonstration of success on the merits

The parties dispute whether the Office for the Blind's success before the arbitration panel constitutes actual success on the merits.  The OFB argues that the Army has lost on the merits of the underlying action and has failed to appeal.  It points to the two arbitration decisions mentioned above: first, the 2002 panel's decision that the Army was obligated to comply with the Act when issuing a solicitation for DFA services, followed by the 2014 panel's similar decision that the Army's issuance of the solicitation to KCA Corporation violated the Act.  These arbitrations decided the merits of the action, the OFB reasons, and therefore constitute success on the merits.

The Army acknowledges that the 2014 arbitration panel ruled in favor of the Office for the Blind. It argues that the arbitration decision does not demonstrate success on the merits, however, as it lacks precedential value for this Court.  The Army contends that Randolph-Sheppard Act arbitration panel decisions do not constitute binding precedent with federal courts and are not to be afforded deference pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See* 20 U.S.C. § 107d-2(a).

Consideration of this matter requires the Court to turn to the Randolph-Sheppard Act itself, which provides for administrative dispute resolution procedures for two distinct varieties of conflicts.  A blind licensee "who is dissatisfied with any action arising from the operation or administration of the vending facility program" is entitled to an evidentiary hearing by the state licensing agency.  *See* 20 U.S.C. § 107d-1(a).  Should the licensee remain "dissatisfied with any action taken or decision rendered as a result of such hearing," he may file a complaint with the Secretary of Education.  The Secretary shall then submit the complaint to arbitration in accordance with § 107d-2.  In the second type of action—the one at

8

issue here—a state licensing agency may seek remedial action against a federal department or agency pursuant to §107d-1(b). When a state licensing agency believes that the federal entity responsible for a facility has failed to comply with the Randolph-Sheppard Act, the state agency may file a complaint with the Secretary of Education, who shall convene a §107d-2 arbitration panel.  Should the panel determine that the "acts and practices" of the federal agency violate the Randolph-Sheppard Act, "the head of [the] department, agency, or instrumentality shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel."  20 U.S.C. § 107d-2(b)(2).

Although no Sixth Circuit authority establishes the deference due a Randolph-Sheppard arbitration panel, courts in sister circuits reviewing arbitration decisions pursuant to the APA have considered the question.  The Army relies heavily upon a decision of the Ninth Circuit, which declined to afford such deference in reviewing a Randolph-Sheppard Act §107d-1(a) arbitration award:

> [W]e do not give any special deference to the arbitration panel's interpretation of the Act.  *Cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984) (holding that courts should give considerable weight to an executive agency's construction of a statutory scheme that it is entrusted to administer).  *Chevron* deference is warranted only when it appears that Congress delated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.  Deference is inapplicable here because the Act does not delegate interpretive authority to the arbitration panel; instead, it gives the Secretary of Education the responsibility of administering the Act and issuing interpretive regulations.  *See* 20 U.S.C. § 107(b).  Although an arbitration panel's decision is considered a final action of the Secretary for purposes of appeal, *see* § 107d-2(a), this is a legal fiction:  an arbitration panel is composed of members appointed by the parties to the arbitration, not of Department of Education officials whose expertise merits our difference.

*Sauer v. U.S. Dep't of Educ.*, 668 F.3d 644 (9th Cir. 2012) (internal quotations and citations omitted).

*See also Washington State Dep't of Servs. for the Blind v. U.S.*, 58 Fed. Cl. 781, 795 (Fed. Cl. 2003) ("The decisions of [Randolph-Sheppard Act arbitration panels], while considered 'final agency action[s]'

under [the Act], 20 U.S.C. § 107d-2(a), are not entitled to *Chevron* deference because they are not adopted pursuant to any formal rulemaking or notice and comment procedure."); *Delaware Dep't of Health & Social Servs., Div. for Visually Impaired v. U.S. Dep't of Educ.*, 772 F.2d 1123, 1139 ("Because under 20 U.S.C. § 107d-2(a) and 5 U.S.C. § 706(2)(A) our decision on legal questions is plenary, on this question we owe the arbitrators no deference.").

This language notwithstanding, the Court agrees with the Office for the Blind that *Sauer* does not govern the case at hand.  The Court does not contest the soundness of the Ninth Circuit's reasoning regarding actions concerning vendors and state licensing agencies.  To be sure, Congress has entrusted the Department of Education with administering and interpreting the Act, and DOE officials possess nuanced expertise and seasoned experience that this Court does not.  Moreover, neither the Office for the Blind nor the Court disputes that an arbitration panel's decision is not subject to *Chevron* deference, as Congress did not afford interpretive authority to arbitration panels convened pursuant to the Act.  *See U.S. v. Mead Corp.*, 533 U.S. 218, 227 ("[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.").  Crucially, though, the instant case concerns a § 107d-1(b) arbitration— that is, one involving a state licensing agency and a federal agency— while *Sauer* addressed a blind licensee's § 107d-1(a) arbitration against the state licensing agency.  This distinction renders not only *Sauer*'s facts but its governing statutory provisions distinct from those at issue here.[2]

---

[2] *Sauer* reviewed an arbitration decision holding that a state licensing agency breached its obligation to a blind licensee by failing to seek enforcement of a previous arbitration award in federal court.  The licensee prevailed:  the arbitration panel concluded that the Act conferred a statutory obligation upon the state licensing agency to file a lawsuit against a federal agency and ordered the state licensing agency to remit damages to the licensee.  When the state licensing agency protested this ruling in federal court, the licensee intervened.

The district court, and ultimately the Ninth Circuit, confronted whether the Randolph-Sheppard Act obligated a state agency to sue a federal agency in an effort to enforce an arbitration award in favor of an individual vendor.  668 F.3d at 654.  Because the complaint was filed under § 107d-1(a)—the provision concerning grievances of blind licensees against state licensing agencies—the arbitration panel's decision was subject to appeal and review as a

Most importantly, although a "person" can appeal an arbitration decision, a federal agency cannot. Generally, a Randolph-Sheppard Act arbitration award is reviewed as a final agency action of the Department of Education under the Administrative Procedure Act ("APA"). 20 U.S.C. § 107d-2(a) ("Such panel shall . . . render its decision which shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5 [the APA]."). According to the APA, "a *person* suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (emphasis added). The APA's excludes federal agencies from its definition of "person." *See* 5 U.S.C. § 701(b)(2), incorporating 5 U.S.C. § 551(2) ("'[P]erson' includes an individual, partnership, corporation, association, or public or private organization other than an agency."). The term "agency" is defined as "each authority of the government of the United States." 5 U.S.C. § 701(b)(1). Therefore, the Army does not constitute a "person adversely affected or aggrieved" under the APA and cannot seek judicial review of final agency actions.

As the United States Supreme Court has explained, "The phrase 'person adversely affected or aggrieved' is a term of art used in many statutes to designate those who have standing to challenge or appeal an agency decision, within the agency or before the courts." *Director, Office of Workers' Compensation Programs, Dep't of Labor v. Newport News Shipbuilding and Dry Dock Co., et al.*, 514 U.S. 122, 126 (1995) (citations omitted). The Court explained that "adversely affected" and "aggrieved" have long been watchwords in federal administrative law and were already familiar phrases in 1946, when they appeared in the APA's judicial review provision. *See* 5 U.S.C. § 702 (entitling "[a] person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute" to judicial review).

---

final agency action. In making this determination, the reviewing courts were tasked with reviewing the legal soundness of the arbitration decision pursuant to the APA. *See* 5 U.S.C. § 706.

> In that provision, the qualification "within the meaning of a relevant statute" is not an addition to what "adversely affected or aggrieved" alone conveys; but is rather an acknowledgement of the fact that what *constitutes* adverse effect or aggrievement varies from statute to statute. As the United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act (1947) put it, "The determination of who is 'adversely affected or aggrieved [. . .] within the meaning of any relevant statute" has "been marked out largely by the gradual judicial process of inclusion and exclusion, aided at times by the courts' judgment as to the probable legislative intent derived from the spirit of the statutory scheme." *Id.* at 96 (citation omitted).

*Newport News*, 514 U.S. at 126-127.  The Supreme Court has interpreted § 702 as requiring a litigant to demonstrate "that he is injured in fact by agency action and that the interest he seeks to vindicate is arguably within the 'zone of interests to be protected or regulated by the statute' in question."  *Id.* at 127 (citations omitted).  The Supreme Court noted the absence of precedent concluding that an agency's "policy interest" sufficiently conferred standing under an "adversely affected or aggrieved" statute.  "To acknowledge the general adequacy of such an interest would put the federal courts into the regular business of deciding intrabranch and intraagency policy disputes—a role that would be most inappropriate." *Id.* at 127.

In *Newport News*, the Supreme Court next turned to the APA's general judicial review provision, noting that it expressly excludes agencies from the category of "person[s] adversely affected or aggrieved."  *Id.* at 127 (citing 5 U.S.C. § 551(2)).  "Since . . . the APA provision reflects the general legislative pattern of administrative and judicial relationships, it indicates that even under specific 'adversely affected or aggrieved' statutes (there were a number extant when the APA was adopted) agencies as such normally do not have standing."  *Id.* at 129 (internal quotations and citations omitted).  Moreover, the Court underscored that when Congress intends to confer standing upon an agency in its governmental capacity, the text says so:  various statutes require the participation of agency heads, empower agencies to initiate civil actions, and authorize agencies to intervene in actions brought by

others.  *Id*. at 129-130 (citing statutes).  Consequently, the Court determined that the phrase "person adversely affected or aggrieved" does not refer to an agency acting in its governmental capacity.

The text of the Randolph-Sheppard Act does not suggest an exception to this principle.  Instead, Congress was silent concerning the federal agencies' standing; therefore, the Court must conclude that Congress intended to withhold such standing.  Because the Army is not a "person adversely affected or aggrieved" within the meaning of the APA, it is not entitled to seek judicial review of an arbitration. Therefore, in the absence of judicial review, "the decision of such panel shall be finding and binding on the parties."  § 107d-1(b).  Given the lack of judicial review available to the Army, the Court is satisfied that the arbitration panel's February 14, 2014, decision constitutes actual success on the merits.

### B.  Plaintiff's irreparable injury and inadequate remedies available at law

The Office for the Blind suggests that grave and irreparable economic harm will allegedly result in the absence of an injunction and will significantly impact First Choice and Ms. Autry, the blind vendor who operated the company.  Because the solicitation at issue was open exclusively to HUBZones businesses, the successor contract was awarded to another firm, effectively ousting First Choice and Ms. Autry.  The OFB relies upon the Sixth Circuit's review of this Court's previous ruling, wherein the appellate court concluded that "requiring the completion of arbitration prior to filing in federal court for a preliminary injunction would likely result in irreparable harm" to the OFB.  (Docket No. 26 at 13.)

As the Sixth Circuit noted, a mere loss of profits generally does not constitute irreparable harm. (Docket No. 26 at 13 (citing *Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574, 581 (6th Cir. 1995)).  However, public policy favors ensuring economic stability and opportunities within the blind community, and sovereign immunity would avert a grant of money damages from the Army to the OFB. (Docket No. 26 at 13.)  Accordingly, the Sixth Circuit concluded that "requiring OFB to complete arbitration before challenging the Army's decision not to apply the Act would result in a loss for which there is no remedy, an irreparable harm."  (Docket No. 26 at 13.)

The OFB argues that it has prevailed on the merits of the case under the arbitration panel's decision, but that the Army has failed to fulfill its obligations under the arbitration decision—namely, to terminate its contract with KCA Corporation and negotiate a new contract with OFB.  The Court agrees that irreparable harm would issue in the absence of the requested relief and that a permanent injunction from a federal court appears to be the sole mechanism that would compel the Army to correct the violation found by the arbitration panel.

### C.  The balance of hardships between the parties

The third factor requires the Court to consider whether the balance of hardships between the parties should the Court grant a permanent injunction.  An injunction would merely require the Army to comply with the arbitration panel's decision, but failing to issue such relief could put First Choice and Ms. Autry at risk of suffering ongoing financial harm.  Moreover, denying injunctive relief would cause Ms. Autry to suffer not only lost profits, but also to forego the purposeful work and social contribution embodied within the Randolph-Sheppard Act.

Although the Army argues that equity does not favor the Office for the Blind's request, it points to no specific hardships that an injunction would cause it to suffer, and the Court perceives no substantial harm that could result.[3]  Instead, the Army argues that the Randolph-Sheppard Act does not apply to contracts for DFA services; therefore, because it insists that the 2014 arbitration decision was contrary to law, the Army contends that a balance of the hardships does not tilt towards an equitable remedy.  As explained above, the APA does not entitle the Army to seek judicial review of the arbitration panel's decision; as such, the Court will not second-guess or evaluate the merits of that decision.  Even were the Army entitled to judicial review, however, the precedents upon which relies are not persuasive.

---

[3] To the contrary, KCA Corporation (which currently holds the contract) and Ms. Autry partnered to deliver both full food services and DFA services before the contract was awarded solely to KCA Corporation.  (Docket No. 27 at 11.)  Both KCA Corporation and the OFB attest that no lapse or change in services would occur should the Court grant the OFB's request.  (*See* Docket No. 27-1, Affidavit of Kyong Cha Anderson, Owner of KCA Corporation.)

In support of its argument that the Randolph-Sheppard Act does not apply to contracts for DFA services, the Army relies primarily upon two Federal Court of Claims decisions.  The first, *Washington State Dep't of Servs. for the Blind v. U.S.*, 58 Fed. Cl. 781 (Fed. Cl. 2003), concerns facts similar to those before this Court.  Washington's agency for the blind challenged the Army's refusal to apply the Randolph-Sheppard Act to a contract for DFA services.  Ultimately, the Federal Court of Claims ultimately opted not to disturb a contracting officer's ruling that a contract for DFA services did not constitute the "operation" of a dining facility.  *Id.* at 796.  In doing so, however, the court noted that there is "no legally-required answer to the question of whether a DFA services contract . . . is governed by [the Randolph-Sheppard Act]."  *Id.*  Consequently, it made no judgment as to whether the Randolph-Sheppard Act encompasses DFA services.

By contrast, in *Mississippi Dep't of Rehabilitation Servs. v. United States*, 61 Fed. Cl. 20 (Fed. Cl. 2004), the state agency alleged that the Navy neglected to afford blind vendors priority pursuant to the Randolph-Sheppard Act for a food services contract for the management of a cafeteria operation.  The Navy insisted that it would retain operational control of the cafeteria and solicited only "discrete services in support of the Navy's operation of that facility" and that the contract was accordingly outside the Randolph-Sheppard Act's scope.  *Id.* at 26.  The court articulated the functions generally required to administer a cafeteria: "menu and price determinations, food acquisition, food preparation, serving functions, cashier functions, cleaning services, quality control, day-to-day management and economic risk."  *Id.* at 28.  Although the solicitation included sanitation and housekeeping, it also sought "food preparation, cooking, baking, and serving; cashier service… and administrative work governing contracted functions."  *Id.* at 29.  The contractor was required to implement a quality control inspection system, carry out training programs, hire personnel, and provide certain supplies and equipment.  Most importantly, the contractor assumed responsibility of the facility's day-to-day management.  *Id.* at 30.  Because the contractor assumed responsibility for these daily functions, the court concluded that it

constituted the facility's "operator" and was therefore subject to the provisions of the Randolph-Sheppard Act.[4]  *Id.* at 31.

The limited decisions concerning this question, then, emphasize the centrality of the contract itself:  is the nature of the responsibilities listed in the solicitation managerial or merely custodial? According to the Stipulated Facts submitted by the parties, "Army personnel are in charge of the dining facilities at Fort Campbell, Kentucky.  KCA employees are responsible for cleaning the dining facilities." (Docket No. 32-1 at 7, ¶¶ 30-31.)   The parties agree that DFA services "typically comprise of janitorial and custodial functions within a dining facility (including, but not limited to, sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning and related quality control."  (Docket No. 32-1 at 8, ¶ 34.)

The Army argues that the solicitation at issue concerns only these ancillary cleaning services, not the dining facility's *operation*; therefore, the Army reasons, the solicitation did not fall within the scope of the Randolph-Sheppard Act.  The Army emphasizes that the Secretary of Education is authorized to prescribe regulations effectuating the Randolph-Sheppard principles when the Secretary determines that "such *operation* can be provided at a reasonable cost with *food* of a high quality comparable to that currently provided to employees, whether by contract or otherwise."  20 U.S.C. § 107d-3(e) (emphasis added).  According to its argument, if no food service is to be provided by the blind vendor and the contractor does not "operate" the dining facility, the solicitation falls outside the auspices of the Randolph-Sheppard Act.  Here, the parties agree that the solicitation sought the provision of "dining facility attendants, janitorial, and custodial services" at the Fort Campbell cafeteria, with military

---

[4] The *Mississippi* court looked to *Washington State*, 58 Fed. Cl. At 786, discussed *supra*, as well as *State of Alaska Dep't of Educ. Div. of Vocational Servs. v. United States Dep't of the Army*, an Alaska arbitration panel decision. Case No. RS/97/2 (Jan. 12, 2000) (Alaska).  As the Court explained, "In *Alaska*, Army military personnel engaged in all but the most mundane custodial work.  The Army selected the menus, cooked and served the food, ordered supplies, maintained quality control and cooking equipment."  *Id.*  Given the limited nature of these responsibilities, the arbitration panel declined to apply the Act.

personnel to retain responsibility for "operating the dining facilities . . . and charged with overall responsibility and accountability for the operation of the dining facilities." (Docket No. 32-1, Stipulated Facts, ¶ 25.)  The Army characterizes the solicitation as exclusively seeking busboy and cleanup services; therefore, it contends that the Office for the Blind was not entitled to bidding priority.

Despite this characterization, however, the solicitation itself suggests that the contractor's duties go beyond that of mere cleanup.  Similar to the duties sought in *Mississippi*, the Fort Campbell solicitation requires the contractor to develop a quality control program (Docket No. 35-3, Statement of Work, at C.1.7); to provide training regarding sanitation, safety and hazard communication, and fire prevention and protection (Docket No. 35-3 at C.1.8-C.1.9); and to operate the mechanical vegetable peeler to prepare potatoes and fruit as needed (Docket No. 35-3 at 5.1.1.2-5.1.1.3).[5]  The solicitation further requires the contractor to provide an on-site quality control manager "who shall inspect all phases of dining facility operations and evaluate against contractual requirements," (Docket No. 35-3 at C.1.2.2.) and to attend weekly meetings during the contract's first month and as needed thereafter, (Docket No. 35-3 at C.1.11).  These services are directly related to providing the cafeteria services contemplated by the statute: "[W]hile housekeeping . . . services are not food-dispensing tasks per se, to the extent that such services are necessary to assure a clean environment for preparing and serving food, they clearly are related to operating a cafeteria facility."  *In Matter of Triple P Servs., Inc.*, 72 Comp. Gen. 241, 246 (1993).

The Court again notes that the Army's argument against applying the Randolph-Sheppard Act to the DFA services at issue has been raised before and dismissed by the arbitration panel.  The arbitration panel's determination is a final one.  However, even were this not the case, the precedent cited by the

---

[5]  The Army contends that the language concerning peeling potatoes and fruit was inadvertently included in the solicitation.  It has since been removed by Contract Modification No. 3.  (Docket No. 32-4.)

Army would not yield a result at odds with the arbitration decision.  Accordingly, the balance of the hardships weighs in favor of granting the OFB's request.[6]

### D.  Public interest

Finally, the OFB contends that the public interest will suffer only in the absence of an injunction. If, instead, the Army's relationship with the OFB and Ms. Autry is restored, Fort Campbell will continue to receive the same quality of DFA services, and the purpose of the Act—that is, to provide remunerative economic opportunities to the blind community—will be effectuated.  The Army responds that injunctive relief will bar the solicitation of DFA contracts under other social programs, all with equally compelling goals, including the AbilityOne Program and the HUBZone program.  Of course, the Court does not

---

[6] The Army argues that the Court must also look to a second statutory scheme:  the Javits-Wagner-O'Day Act, ("JWOD Act"), 41 U.S.C. §§ 46-48c, was also designed to provide blind members of the community with opportunities for remunerative employment.  Now known as the AbilityOne Program ("AbilityOne"), this scheme creates an independent federal agency, the Committee for Purchase From People Who Are Blind and Severely Disabled ("the Committee"), to stimulate government contracting with certain nonprofit agencies that employ individuals with disabilities.  The Committee is charged with creating and maintaining a "procurement list" of goods or services offered by sale by any qualifying nonprofit agency for blind or severely disabled individuals.  41 U.S.C. §§ 47(a), 47(d).  The statute requires any government agency with a need for any goods or services on the procurement list to afford priority to a qualifying nonprofit agency.  41 U.S.C. § 47(d)(2).

In response to confusion concerning the interplay between the Randolph-Sheppard Act and the JWOD Act, Congress passed Section 848 of the National Defense Authorization Act ("NDAA") of Fiscal Year 2006, Pub. L. 109-163, requiring the Committee, the Department of Education, and the Department of Defense to submit a joint report setting forth policy regarding the application of the JWOD Act and the Randolph-Sheppard Act to military dining contract procurements.  The Department of Defense, the Department of Labor, and the Committee also issued a ten-section joint analysis ("Analysis") of the report.  Only one of the ten recommendations was enacted into law: its "no poaching" provisions protecting existing contracts were codified in Section 856 of the John Warner National Defense Authorization Act of 2007, P.L. 109-364.

Because much of the Army's argument relies upon these documents, the Court will briefly address them.  Were the merits of the arbitration panel's decision subject to judicial review, the Department of Education's definition of the "operation" of a cafeteria" would likely be weighed as persuasive evidence, given the agency's specialized experience and more comprehensive information and investigation.  *See U.S. v. Mead Corp.*, 533 U.S. 218, 234 (2001).  Crucially, however, the merits of that case are not subject to this Court's review.  The Court must assume that the arbitration panel afforded the Joint Report and Analysis with the weight it deemed appropriate.  At any rate, these documents cannot serve as the basis to alter the arbitration panel's decision in the instant action.  Because the merits of the arbitration panel's decision are not subject to this Court's review, the Court will not address the policy choices and recommendations they set forth.

doubt the worthiness of these initiatives.  However, at the heart of the Army's insistence is its argument that the Randolph-Sheppard Act does not apply here.  This determination does not lie with this Court, nor does it arise in the procedural context of the OFB's motion for injunctive relief.  The arbitration panel has already issued the final word on the matter.  Accordingly, the Court finds that the public interest favors awarding injunctive relief.

In balancing these factors, the Court finds that they weigh determinatively in favor of the Office for the Blind.  Accordingly, the Office for the Blind has satisfied its burden for permanent injunctive relief, and its request for such will be granted.

## II.   Motion to Dismiss

Finally, the Court turns to the Office for the Blind's Motion to Dismiss the Army's Counterclaim, (Docket No. 34), to which the Army has responded, (Docket No. 36), and the OFB has replied, (Docket No. 38).  In its Counterclaim, the Army seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the Randolph-Sheppard Act applies to neither Contract W91248-13-D-0001 nor the solicitation for it concerning DFA services at Fort Campbell.  The Army also seeks a broader judgment declaring that the Act does not apply to solicitations and contracts that only procure DFA services.  Finally, the Army requests that the Court declare that the arbitration panel's decision exceeded its statutory and regulatory authority by ordering the Army to take certain action.  (Docket No. 30.)  In its Motion to Dismiss, the OFB contends that the Army seeks merely to relitigate the merits of the arbitration decision, attempting to create an additional means of appeal when none exists.

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  The Act is an enabling act, which extends the jurisdiction of the court beyond the jurisdictional basis initially required.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995).  While this Act authorizes district courts to exercise jurisdiction, it does not

mandate or impose a duty to do so.  *Bituminous Cas. Corp. v. J & L Lumber Co., Inc.*, 373 F.3d 807, 812 (6th Cir. 2004); *Allstate Ins. Co. v. Mercier*, 913 F.2d 273, 276 (6th Cir. 1990), *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995).  The Act convers on the "federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."  *Wilton*, 515 U.S. at 286.  A district court may not decline jurisdiction, however, as a matter of whim or personal disinclination.  *Mercier*, 913 F.2d at 277; *see also Green v. Mansour*, 474 U.S. 64 (1985) (characterizing the statute as "'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" (quoting *Public Service Comm'n v. Wycoff Co., Inc.*, 344 U.S. 237 (1952)).

In determining whether the exercise of jurisdiction is proper, the Court must consider five factors:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata'; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W.R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984).  However, in light of the above grant of injunctive relief, the Court will dismiss as moot the Army's request for declaratory judgment concerning the Act's application to Contract W91248-13-D-0001 and the solicitation associated with it.

The Army further submits that the arbitration panel exceeded its authority under the Randolph-Sheppard Act by ordering a specific remedy.  The arbitration panel's Decision and Award directs the agency head to:

> 1. Immediately notify KCA that its contract will be terminated on its next anniversary date, March 31, 2014.
> 2. Immediately commence negotiations with the [OFB] for the services previously provided by KCA after the expiration of the KCA contract on its renewal date[.]

(Docket No. 27-2 at 28.)  The Decision and Award further specifies that "[a]ny contract negotiated with [the OFB] shall take effect immediately upon the expiration of the Agreement with KCA."  (Docket No. 27-2 at 28.)  The Army submits that the arbitration panel's decision constitutes an unenforceable *ultra vires* act, as the Randolph-Sheppard Act does not authorize an arbitration panel convened under § 107(d)-1b to direct specific actions to remedy violations of the Act.

The Randolph-Sheppard Act tasks the agency head with remedying any violation of the Act.

> If the panel appointed pursuant to paragraph (2) finds that the acts or practices of any such department, agency, or instrumentality are in violation of this chapter, or any regulation issued thereunder, the head of any such department, agency, or instrumentality shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel.

20 U.S.C. § 107d-2(b)(2).  Therefore, the statute's plain language provides that an arbitration panel reviews a federal agency's actions to determine if they violate the Act, but only the head of the federal entity is responsible for ending the violation.  Congress leaves remedial action to the head of the federal entity and does not authorize a§ 107d-1(b) arbitration panel to order any specific action.

Courts of sister circuits have discussed the remedial provisions created by the Act and the grants of authority associated with this framework.  The Eleventh Circuit has concluded that an arbitration panel considering such a conflict may determine whether or not the federal entity has complied with the Act, but may not order a specific remedy:

> [Section 107-d2(b)(2)] specifically grants the arbitration in subsection (b) cases authority to decide whether the federal entity's acts "are in violation" of the Act.  The provision, however, limits the panel's authority to that decision alone:  although the panel may determine that a violation is occurring and may identify the discrete acts that are in violation, the statute does not authorize the arbitration panel to order the federal entity to take any remedial action.  Rather, the statute expressly places the obligation of ending the violation on the federal entity itself.

*Georgia Dep't of Human Resources v. Nash*, 915 F.2d 1482, 1492 (11th Cir. 1990).   Although the arbitration panel's decision constitutes the Department of Education's final agency action, the Secretary of Education has no authority to order another federal entity to act one way or another.   "The subsection (b) panel . . . under the Act's express terms, has no remedial powers whatsoever.   It may determine that certain of the federal entity's acts violate the Act, but the Act leaves responsibility for remedying the violation to the federal entity itself."   *Id.*   Therefore, if Section 107d-2 did not expressly require a federal entity to take or terminate action pursuant to the panel's decision, no substantive remedy would exist in such cases.   *Id.*

The Fourth Circuit also determined that a § 107d-1(b) arbitration panel lacks authority to award a specific remedy for a violation of the Act.   *Maryland State Dep't of Educ., Div. of Rehabilitation Servs. v. U.S. Dep't of Veterans Affairs*, 98 F.3d 165 (4th Cir. 1996).   The court acknowledged that under its interpretation, a federal entity could "simply refuse" to remedy the violations found by an arbitration panel.   *Id.* at 170.   Indeed, "it may have been wiser for Congress to have provided for an automatic review of the remedial steps taken by a federal entity in response to an arbitration decision."   *Id.* at 170-71.   This potential hindrance, however, fails to rise to the level of absurdity necessary to disregard the plain language of the statute.   Moreover, such a situation is not without a remedy, albeit a cumbersome one: the Fourth Circuit reasoned that should a state licensing agency object to the federal entity's response to an arbitration panel's decision, the state agency may file another complaint with the Secretary, initiating a second arbitration panel to determine "whether the federal entity's acts in response to the first decision bring it into compliance with the Act."   *Id.* at 171.

This Court echoes the understandings of the Fourth and Eleventh Circuits, concluding that the statute's plain language limits the arbitration panel's authority:   although the arbitration panel is tasked with determining whether the federal entity has violated the statute, the responsibility for correcting such a violation lies with the head of the federal entity.   Therefore, when an arbitration panel fashions a specific remedy in issuing its final decision, it has exceed its authority under § 107d-2(b)(2).   The Court,

of course, retains the power to issue such orders. The Army remains bound by the terms of the permanent injunction discussed above and to be granted in the Court's accompanying Order.

## CONCLUSION AND ORDER

In accordance with the above analysis, the Court hereby ORDERS the following:

I.    The Office for the Blind's Motion to Stay Proceedings, (Civil Action No. 5:14-cv-00056-TBR, Docket No. 10), shall be denied.

II.   The Office for the Blind has made the requisite showing for a Permanent Injunction, having satisfied each of the necessary factors.  Accordingly, the Court will grant the Office for the Blind's Motion for Permanent Injunction, (Civil Action No. 5:12-cv-00132-TBR, Docket No. 27), in accordance with this Memorandum Opinion.   The Army shall reopen the bidding process for the contract to provide DFA Services at the dining facilities located at Fort Campbell, Kentucky.  This bidding process shall be conducted subject to the specifications of the Randolph-Sheppard Act, including those requiring preference to be afforded to licensed blind vendors who satisfy the statutory requirements.   The Army shall notify KCA Corporation that Contract W91248-13-D-0001 shall be terminated as of the date that a successfully negotiated contract with a licensed blind vendor becomes effective.  At the time such contract becomes effective, the Army shall be prohibited from proceeding under its current contract with KCA Corporation and shall terminate its contract with same.

III.  The Office for the Blind's Motion to Dismiss Defendant's Counterclaim, (Civil Action No. 5:12-cv-00132-TBR, Docket No.34), shall be granted in part and denied in part.

IV.   The Army's Motion for Summary Judgment, (Civil Action No. 5:14-cv-00056-TBR, Docket No. 15), shall be dismissed as moot.

V.    No oral argument having been necessary, both Motions for Oral Argument, (Civil Action No. 5:14-cv-00056-TBR, Docket No. 20; Civil Action No. 5:12-cv-00132-TBR, Docket No. 37), will be denied.

This is a final and appealable Order, there being no just cause for delay.